# Exhibit A

EXECUTION COPY

## DEVELOPMENT AND SUPPLY AGREEMENT

This DEVELOPMENT AND SUPPLY AGREEMENT (the "Agreement") is entered into effective as of June 1, 2012 (the "Effective Date"), by and between Biomerics, LLC, a Utah limited liability company ("Biomerics"), with its principal place of business at 2700 South 900 West, Salt Lake City, Utah 84119; and Nimbus Concepts (Spine), LLC., a Delaware corporation ("Nimbus"), with its principal place of business at 925 Lincoln PH, Denver, Colorado 80203. This Agreement sometimes refers to the foregoing parties individually as a "Party" and collectively as the "Parties."

RECITALS

A.      Biomerics is an OEM contract manufacturer of medical devices.

B.      Nimbus is a medical device developer of medical device solutions for the pain management market.

C.      Nimbus desires to contract Biomerics to perform certain development, manufacturing, sales support, and fulfillment services for Nimbus under the terms and conditions of this Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the covenants, promises, and obligations set forth herein, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Biomerics and Nimbus mutually agree as follows:

**1.   Definitions.** In addition to terms defined elsewhere in this Agreement, including in the preamble and Recitals, the following terms shall have these meanings as used in this Agreement:

1.1     "Act" means the United States Federal Food, Drug and Cosmetic Act, as amended from time to time, and the rules, regulations and guidelines promulgated thereunder.

1.2     "Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person at any time during the period for which the determination of affiliation is being made. A Person shall be regarded as in control of another Person if it owns, or directly or indirectly controls, at least fifty percent (50%) of the voting stock or other ownership interest of the other Person, or if it directly or indirectly possesses the power to direct or cause the direction of the management and policies of the other Person by any means whatsoever.

1.3     "Background IP" means any and all existing Intellectual Property that is either (a) owned by a Party and its Affiliates prior to the Effective Date or (b) licensed to

such Party and its Affiliates prior to the Effective Date with the right to use or sublicense such Intellectual Property to a third party.

1.4  "Change of Control" means, with respect to a Party or an Affiliate that controls such Party ("Party Parent Company"), the occurrence of the following in one transaction or a series of related transactions: (a) the merger or consolidation of a Party or its Party Parent Company into or with another Person not an Affiliate of such Party or its Party Parent Company (as the case may be) that results in the holders of the voting securities of such Party or such Party Parent Company immediately prior to such merger or consolidation holding in the aggregate less than a majority of the combined voting power of the voting securities of the resulting entity after such merger or consolidation or (b) the sale, exchange or other transfer by a Party or its Party Parent Company of (i) all or substantially all of its assets to any other Person not an Affiliate of such Party or its Party Parent Company (as the case may be), or (ii) a majority of all of the voting securities of such Party or its Party Parent Company to any other Person not an Affiliate of such Party or its Party Parent Company (as the case may be).  In the event of a Change of Control of a Party, such Party shall notify the other Party, in writing, promptly upon the consummation of such Change in Control.

1.5  "Confidential Information" means any information that (a) in any way relates to a Party or its Affiliates, including its products, business,  business strategies and technology, and (b) is furnished or disclosed to the other Party in connection with this Agreement, and is identified as "confidential" (or words of similar import) upon such disclosure; provided, however, that the term "Confidential Information" shall not include any specific information that (i) at the time of disclosure, is generally available to the public; (ii) after disclosure hereunder, becomes generally available to the public, except as a result of a breach of this Agreement by the recipient of such information; (iii) becomes available to the recipient of such information from a third party that is not legally or contractually prohibited by the disclosing Party from disclosing such information; or (iv) the recipient of which can demonstrate by contemporaneous documentation was developed by or for such recipient without the use of any of the Confidential Information of the disclosing Party or its Affiliates hereunder.

1.6  "Developments" means any and all inventions (whether or not patentable), works of authorship of any type, trade secrets, know-how and any Intellectual Property related to medical devices (including their manufacture and methods of use) that is conceived, created, authored, invented, reduced to practice, or otherwise developed, solely or jointly, by the Parties, one Party and/or its respective Affiliates, as of the Effective Date or during the Term of this Agreement.

1.7  "Field" means the management of pain in humans by radiofrequency neurotomy.

1.8  "Governmental Authority" means any United States or foreign government, governmental authority, court, tribunal, agency, or other regulatory, administrative, or judicial agency, commission, or organization, and any subdivision, branch, or department of any of the foregoing.

1.9  "Intellectual Property" means any and all (a) patents, utility models, design registrations, certificates of invention, and other governmental grants for the protection of inventions or industrial designs, including any reissues, renewals, re-examinations or extensions thereof, and applications for any of the foregoing, including provisional, divisional, continuation, and continuation-in-part applications; (b) registered and unregistered trademarks, service marks, trade names, trade dress, brand names, logos, applications for registration, and all goodwill associated therewith; (c) works of authorship, copyrights, copyright registrations, copyright registration applications, and all other rights corresponding thereto, including author's rights and moral rights; (d) confidential information, trade secrets, and other nonpublic know-how, including inventions, discoveries, improvements, concepts, ideas, methods, processes, designs, schematics, drawings, formulae, technical data, specifications, research and development information, databases, and technology, manufacturing information (including specifications, manufacturing procedures and protocols, quality control procedures and data, vendor lists, and manufacturing equipment documentation and validation procedures), and all other rights in know-how and confidential and proprietary information; (e) rights to sue for past, present, and future infringements, misappropriations, dilutions, violations, and other unauthorized uses of any of the foregoing, including the right to recover damages and to obtain any other relief; and (f) all similar or corresponding existing and future rights throughout the world.

1.10  "Law" means any federal, state, local, foreign, or international law, statute, treaty, ordinance, rule, regulation, act, order, judgment, ruling, or binding pronouncement of any Governmental Authority, including the Act.

1.11  "Person" means any natural person or any corporation, partnership, trust, limited liability company, association, organization, Governmental Authority, or other legal entity.

1.12  "Products" means any and all of the following products that Biomerics is contracted to supply to Nimbus or third parties (on Nimbus's behalf) pursuant to this Agreement:  "Nimbus Devices" are defined as (i) the Nimbus Electrosurgical Radiofrequency Multitined Expandable Electrode for large lesion neuroablation (including size, length, and tip variations); and (ii) any RF pain management procedural device based on Nimbus Intellectual Property that the Parties agree to add as a "Product" hereunder pursuant to a written amendment to this Agreement, executed by each of the Parties hereto.

1.13  "Regulatory Registrations" means any and all licenses, registrations, authorizations, certifications, clearances and approvals of any applicable Governmental Authority necessary for the development, manufacture, distribution, marketing, promotion, offer for sale, use, import, export and sale of Product(s) in a regulatory jurisdiction in the Territory, including 510(k) clearances and CE listing.

1.14  "Regulatory Materials" shall mean regulatory applications, notifications, registrations, Regulatory Registrations or other submissions made to or with an applicable Governmental Authority, and supporting documentation, data and information

3

(including each Product's design history file, design, listing file and other design control documentation), that are necessary or reasonably desirable in order for the development, manufacture, distribution, marketing, promotion, offer for sale, use, import, export and sale of Product(s) in a regulatory jurisdiction in the Territory.

1.15 "Specifications" means the specifications for each Product, including the design, manufacture, packaging, labeling and quality control specifications (a) with respect to the Nimbus Device, as set forth on Exhibit A and (b) as to any other Product as mutually agreed in writing by the Parties.

1.16 "Territory" means worldwide.

## 2. Supply of Products to Nimbus.

2.1 Product Exclusivity.

(a) Subject to the terms of this Agreement, Nimbus shall exclusively purchase Products in the Field for use or resale in the Territory from Biomerics for the Term of this Agreement.

(b) Subject to the terms of this Agreement, neither Biomerics nor its Affiliates shall, directly or indirectly, develop, manufacture, supply, offer for sale, sell, distribute or otherwise make available (or license, authorize, assist, advise or otherwise contract with a third party to do any of the foregoing) any product in the Field in the Territory for the Term of this Agreement, other the Products for Nimbus as provided herein, without the express written consent of Nimbus.

(c) The Parties acknowledge and agree that both Parties are investing substantial efforts, resources, and opportunity costs with respect to this Agreement and that the above exclusivity provisions are therefore reasonable in all respects.

2.2 Purchase Orders.

(a) Nimbus will purchase Products from Biomerics under this Agreement by submitting or causing Nimbus customers to submit purchase orders to Biomerics (each, an "Order"). Each Order, after delivery to and acceptance by Biomerics, will constitute a binding agreement governed by this Agreement; provided that any order submitted by a Nimbus customer to Biomerics directly shall also require Nimbus's acceptance prior to becoming binding on Nimbus. Unless otherwise agreed in writing and signed by both Parties, any provision in an Order that is inconsistent with any provision of this Agreement shall be of no force or effect. An Order received by Biomerics shall be deemed accepted by Biomerics if Biomerics does not deliver to Nimbus a written rejection of the Order and the reasons for such rejection within five (5) days of Biomerics's receipt of the Order. Subject to the foregoing, all Orders will become binding on the Parties on the earlier of (a) written acceptance by Biomerics, (b) shipment of the Products by Biomerics, or (c) constructive acceptance of the Orders as provided in this Section 2.2. To the extent of any conflict or inconsistency between this Agreement and any purchase order (including an Order), purchase order release,

4

confirmation, acceptance, acknowledgment or any similar document, the terms of this Agreement shall govern.

(b)    Biomerics hereby accepts each of the following purchase orders for Nimbus Product: (1) Purchase Order from RS Medical in the form of Exhibit B attached hereto ("RS Demo Purchase Order") to provide 500 units (not for human use and 500 units (sterile, but not for human use until 510(k) clearance) of the Nimbus Device for demonstration usage; for which Biomerics acknowledges receipt of $25,000 as full payment therefor and (2) Purchase Order from RS Medical in the form of Exhibit C attached hereto ("RS Stocking Order") for 10,000 units of Nimbus Device for $25.00 per unit to be paid as provided in Section 2.3 below with delivery subject to receipt of 510(k) clearance on Nimbus Device.

    2.3    Price, Delivery, and Payment.

(a)    The price for Products supplied by Biomerics to Nimbus pursuant to this Agreement will be agreed upon in advance and in writing by the Parties; provided that the price for the Nimbus Device shall not exceed $25.00 per unit during the Term of this Agreement or thereafter for Nimbus Devices supplied pursuant to Section 8.4 hereof.

(b)    Prices do not include shipping charges. If shipping charges are applicable, they will be separately stated on Biomerics's invoice.

(c)    All applicable taxes, including but not limited to sales and use taxes, and other charges such as duties, customs and tariffs, will be stated separately on Biomerics's invoice and Nimbus shall be responsible for payment thereof (including reimbursement of amounts paid by Biomerics). Biomerics will remit all such charges to the appropriate tax authority on a timely basis as required by law, unless Nimbus provides proof of tax exemption. Notwithstanding the above, each Party is responsible for its own respective income taxes or taxes based upon gross revenues, including but not limited to business and occupation taxes.

(d)    Biomerics will package, pack, mark and ship the Products for delivery in a manner consistent with reasonable commercial practices designed to provide for safe keeping of the Products during shipment. Shipping terms are FOB, Biomerics's manufacturing facility, prepaid and add. Each package will include a packing list that specifies the purchase order number. Shipments will conform to the quantities and delivery schedules on each purchase order accepted by Biomerics (and, as applicable Nimbus) as specified in Section 2.2.

(e)    All Products ordered under this Agreement shall be delivered or provided to Nimbus or Nimbus assigns within the time specified in the Order, unless the Parties mutually agree otherwise.

(f)    Unless otherwise agreed to by the Parties, Nimbus agrees to pay Biomerics in full for all Products within forty-five (45) days after Nimbus's receipt of the applicable invoice for such Product. Biomerics shall invoice Nimbus for each shipment of Product on and after the shipment date. Notwithstanding the foregoing, payment terms

for the RS Stocking Order shall be 34% of the aggregate purchase price within 5 days of the Effective Date, 33% of the aggregate purchase within 30 days of Product shipment and the remainder within 60 days of Product shipment.

2.4     Late Shipments. If Biomerics is not able to meet the delivery date for the Products specified on the purchase order, Biomerics will immediately notify Nimbus and (as applicable) Nimbus's customer in writing and include the reasons therefore. In such event, Biomerics will ship the Products on an expedited basis.

2.5     Timely Delivery. If Biomerics fails to timely deliver at least eighty percent (80%) of the amount of Products ordered by Nimbus or its customers pursuant to Orders hereunder over any period of one-hundred and twenty (120) or more consecutive days, then, in addition to any other rights Nimbus may have, Nimbus, without further notice to Biomerics, shall be relieved of any obligation under Section 2.1(a) to exclusively purchase all of the Products from Biomerics. Subject to the foregoing, in the event Biomerics is unable to supply due to a force majeure event, Nimbus agrees to work with Biomerics to develop alternative supply option while retaining its exclusivity supply position. For the purposes hereof, Product rejected as non-conforming shall not be considered delivered.

2.6     Alternative Manufacturing Site. In the event Biomerics exclusive rights are terminated (either pursuant to Section 2.5 or upon termination or expiration of this Agreement), at Nimbus's request, Biomerics shall provide reasonable assistance to Nimbus in the transfer of all or a portion of Product production to such alternative manufacturing site. In consideration of the assistance provided by Biomerics pursuant to this Section 2.6, Nimbus shall pay Biomerics a fee based on Biomerics then standard rates for such services and reimburse Biomerics its out-of-pocket costs incurred in providing such assistance so long as such fees and costs are approved in writing in advance by Nimbus and supported by reasonable documentation (copies of which shall be provided to Nimbus at its request).

2.7     RS Medical Distribution Agreement. Biomerics acknowledges that Nimbus has entered into a Distribution Agreement dated June 1, 2012 ("RS Medical Distribution Agreement") with International Rehabilitative Sciences, Inc. ("RS Medical") pursuant to which Nimbus has agreed to supply to RS Medical Nimbus Devices for resale in the United States for use within the Field. Biomerics acknowledges its receipt of a copy of the RS Medical Distribution Agreement. To the extent the manufacturing and supply obligations of Nimbus set forth in the RS Medical Distribution Agreement are more onerous than the manufacturing and supply obligations of Biomerics set forth herein, then, in addition to any obligations Biomerics has undertaken under this Agreement, Biomerics hereby agrees to supply Nimbus Devices to Nimbus and its customers hereunder on terms that will ensure that Nimbus has the ability and a reasonable opportunity to comply with the terms of the RS Medical Distribution Agreement. Without limiting the foregoing, Biomerics agrees to the requirement to enter into a Supplier Quality Agreement with RS Medical as provided in Section 12.2 of the RS Medical Distribution Agreement.

## 3. Quality Control.

3.1    Specifications; Change Control.  The Specifications for each Product shall not be changed or amended, except by mutual written agreement of the Parties. With respect to any Specifications changes that are required by applicable Law, the Parties shall reasonably cooperate in making such changes promptly, and Biomerics shall, unless otherwise mutually agreed to in writing by the Parties, bear the costs of implementing such changes.  With respect to Specifications changes that are not required by applicable laws, the Parties shall cooperate in good faith to reach a mutually agreeable solution with regard to such changes and the cost of making a discretionary change shall be borne solely by the Party initiating the change or as otherwise mutually agreed to in writing by the Parties.  Subject to securing Nimbus's approval as to any change as provided above, Biomerics shall give Nimbus 180 days' written notice prior to making any design change to the Product that affects form, fit or function and 60 days' notice for any design change to the Product that does not affect form, fit or function.

3.2    Manufacture.  Biomerics shall manufacture all Products or cause them to be manufactured in a facility that is certified under ISO 13485 and in accordance with (1) the applicable Specifications, (2) Biomerics's (or its manufacturer's) quality control system, (3) current best manufacturing practices specified by U.S., Canadian, and European practices and by all applicable U.S. Laws, and (4) upon delivery of such Products to Nimbus or its customers, each such Product shall not be adulterated or misbranded under the Act or other applicable Law.

3.3    Quality Control Program. Biomerics shall maintain a comprehensive process and quality control program. The quality control program will be part of a quality management system that supports the ISO 13485 or substantially similar standards. Biomerics shall maintain, quality records in accordance such standards.

3.4    FDA Requirements. Biomerics shall comply with all FDA requirements applicable to it as a medical device manufacturer, including requirements for medical device listing and establishment registration, Adverse Event reporting (Medical Device Reporting) and current good manufacturing practices as promulgated under the Act.

3.5    Reduction of Hazardous Substances; Recycling. To the extent required by applicable Laws, Biomerics shall comply, with mandatory reduction of hazardous substances and materials or equipment recycling requirements (e.g., RoHS) required for the Products.

3.6    Recall.  In the event either Party believes it may be necessary to conduct a recall, field correction, market withdrawal, stock recovery, or other similar action with respect to any Product (a "Recall"), the Parties shall consult with each other as to how best to proceed, it being understood and agreed that the final decision as to any Recall of any such Product shall be made by Nimbus; provided, however, that Biomerics shall not be prohibited hereunder from taking any action that it is required to take by applicable Laws.  Nimbus shall bear all costs in connection with any such Recall; provided, however, that (a) Nimbus will not be responsible for the costs of Biomerics's personnel,

and (b) Biomerics shall reimburse Nimbus for all reasonable out-of-pocket expenses incurred by Nimbus in connection with any such Recall (including, at Nimbus's option, replacement or refund of recalled Product) to the extent attributable to (i) any breach by Biomerics hereunder, (ii) the failure of Biomerics to comply with applicable Laws, or (iii) the negligent or willful misconduct of Biomerics. Notwithstanding the foregoing, nothing in this Section 3.6 shall reduce either Parties indemnification obligations under Section 7.

3.7    <u>Adverse Event Reporting</u>. Biomerics shall be responsible for all reporting to regulatory authorities of all Adverse Events associated with the use of Products. Nimbus shall notify Biomerics of any report of an Adverse Event concerning the Products within five (5) calendar days of receipt of the report and provide Biomerics with information as required by applicable Laws or as reasonably requested by Biomerics. Nimbus shall cooperate with Biomerics as necessary to report such Adverse Event when so required under applicable Laws. As used herein, "<u>Adverse Event</u>" shall mean any event which requires the filing of a report with the FDA under the medical device reporting (MDR) requirements of 21 Code of Federal Regulations Section 803, or the filing of a report of similar nature to any other applicable governmental authority or agency in the Territory.

3.8    <u>Product Complaints</u>. In compliance with applicable Laws, Biomerics shall establish a method or procedure for handling Product Complaints as well as maintain a file for each such Product Complaint. It will also notify Nimbus of Product Complaints on a monthly basis, or otherwise no less frequently than required by such applicable Laws, and will thereafter keep Nimbus reasonably abreast of developments regarding the Product Complaint, including the manner in which it is resolved. The Parties shall cooperate and use good faith efforts to assist in the resolution of Product Complaints. As used herein a "<u>Product Complaint</u>" shall mean any written, electronic or oral communication that alleges deficiencies related to the identity, quality, durability, reliability, safety, effectiveness or performance of the Product after it is released for sale.

3.9    <u>FDA Communications</u>. Biomerics shall promptly notify Nimbus in the event Biomerics receives any communication or notice from the FDA or other Governmental Authority with respect to the Products or an inspection of the facility where any of the Products is manufactured, and Biomerics shall promptly provide a copy of such communications to the extent applicable to the Products to Nimbus. The Parties shall cooperate in good faith in responding to any such FDA or other Governmental Authority inquiry or in making any report to the FDA or other Governmental Authority (as the case may be) with respect to any of the Products.

3.10    <u>Inspections</u>.

(a)    Biomerics shall maintain and operate the manufacturing facility at which any of the Products are manufactured, and shall implement such quality control procedures, so as to cause Biomerics to be able to perform its obligations hereunder. Upon Nimbus's written request, and at its expense, Biomerics shall permit representatives of any and all of Nimbus, RS Medical or Nimbus's customers to inspect Biomerics's manufacturing

8

facility, upon reasonable notice (not to exceed 10 days) and during normal business hours to assess such facility's compliance with applicable Law and the terms of this Agreement, including current Good Manufacturing Practices and other quality assurance standards as such relate to the manufacture of the Product. Biomerics shall also permit Nimbus reasonable periodic visits to discuss and review manufacturing and supply issues with management of Biomerics.

(b)    If Biomerics or its facility is inspected by representatives of any Governmental Authority in connection with any of the Products, including Biomerics's manufacture of any Product, then Biomerics shall notify the Nimbus promptly upon learning of such inspection, and shall, within 5 days of such notice, supply Nimbus with copies of any correspondence or portions of correspondence which relate to the Product in Biomerics's possession. If Biomerics receives any regulatory letter or comments from any Governmental Authority in connection with any of the Products, including Biomerics's manufacture of any Product requiring a response or action by Biomerics, including, but not limited to, receipt of a Form 483 (Inspectional Observations) or a "Warning Letter," Biomerics shall promptly following Biomerics's receipt thereof, provide Nimbus with a copy of such communication. The Parties shall cooperate in good faith in responding to any such any regulatory letter or comments from any Governmental Authority. Biomerics shall promptly provide Nimbus with a copy of any final response prior its submission to the regulatory authority.

3.11    <u>Additional Biomerics Obligations</u>. Biomerics shall perform the following during the Term of this Agreement:

(a)    Seek 510(k) clearance for the Nimbus Device in a timely manner and, once obtained, maintain 510(k) clearance for the sale and marketing of the Nimbus Device in the United States for use in the Field.

(b)    Ensure Biomerics is registered with the FDA as a medical device manufacturer or contract manufacturer in accordance with 21 CFR part 807. Biomerics shall notify Nimbus if Biomerics loses its status as an FDA registered medical device manufacturer.

(c)    Develop and manufacture Product compatible with RF generators, as identified by Nimbus.

(d)    Maintain engineering and development resources to modify and/or improve Product, as appropriate.

(e)    Maintain a manufacturing capability to support the commercialization plan of RS Medical and forecasts and purchase orders provided by RS Medical under the RS Medical Distribution Agreement.

(f)    Provide, as requested by Nimbus or its customers, a reasonable quantity of sales demonstration Products (i.e., not for human use or commercial sale) at a price not to exceed $25.00 each for the Nimbus Device or as otherwise agreed for any other Product.

(g)     Comply with all applicable Laws.

(h)     Ensure Biomerics has a disaster recovery plan.

## 4. Development, Regulatory and other Contract Services.

4.1     <u>Development Projects.</u>  From time to time, Parties may agree to develop additional Projects by executing a Development Plan which shall be added via addendum to this Agreement.  The resultant Products shall be governed by the terms and conditions of this Agreement.  The specific terms and conditions of the development costs shall be specified in the Development Plan. To the extent of any conflict or inconsistency between this Agreement and any Development Plan, the terms of this Agreement shall govern.

4.2     <u>Regulatory Registrations.</u>

(a)     Biomerics acknowledges and agrees that Nimbus owns all rights in and to any Regulatory Registrations and Regulatory Materials for the Products.  For no additional consideration, Biomerics, on behalf of itself and its Affiliates, hereby irrevocably assigns any and all rights it and its Affiliates may have in any Regulatory Registrations and Regulatory Materials for the Products to Nimbus.  Without limiting the generality of the foregoing, Biomerics agrees that, without additional consideration, it will take such further actions and timely execute such other documents and instruments as are necessary or appropriate to confirm and record such conveyances and assignments, including any actions, documents, and instruments required by the applicable Governmental Authority to confirm the same or as otherwise may be necessary or appropriate to protect, secure, and vest good, valid, and marketable title in Nimbus , its successors, and assigns.

(b)     Subject to Section 4.2(a) above, Nimbus hereby appoints Biomerics as Nimbus's agent ("<u>Regulatory Agent</u>"), during the Term of this Agreement, in the United States and the European Economic Area ("<u>EEA</u>") with respect to dealings with the U.S. Food and Drug Administration and the applicable EEA Notified Body relating to the Nimbus Device and such other Products as the Parties may hereafter from time to time mutually agree in writing and any applicable Regulatory Registrations for the Nimbus Device and such other Products in such jurisdictions. During the Term of this Agreement, Nimbus also appoints Biomerics as the FDA manufacturer of record and the manufacturer of record for CE listing in the EEA for the Nimbus Device and such other Products as the Parties may hereafter from time to time mutually agree in writing.

(c)     As Nimbus's Regulatory Agent and the FDA manufacturer of record of the Nimbus Device, subject to Section 4.2(a), Biomerics has applied to the FDA, in Biomerics' name, for, and will seek for the benefit of Nimbus, 510(k) clearance for the Nimbus Device. As Nimbus's Regulatory Agent and the manufacturer of record for CE listings of the Nimbus Device, subject to Section 4.2(a), Biomerics has complied with the applicable provisions of the EEA for CE mark listing of the Nimbus Device. Biomerics shall comply with all Laws applicable to the holder of any 510(k) clearance, CE listing or other Regulatory Registrations issued in Biomerics' name and shall

10

maintain each and every Regulatory Registration issued in its name in full force and effect, subject to Nimbus's compliance with Section 4.2(f).

(d)     Nimbus may, at its sole discretion, effective upon written notice to Biomerics, terminate Biomerics as the Regulatory Agent. Upon such termination, or upon any termination or expiration of this Agreement, or otherwise at the written request of Nimbus, Biomerics shall file documents with the FDA or other applicable Governmental Authority to have any and all Regulatory Registrations then issued in the name of Biomerics  issued in the name of Nimbus or its designated Affiliate, for no additional consideration.

(e)     Biomerics shall not make any filings or communicate with the FDA or other Governmental Authority regarding any Products or any Regulatory Registrations without Nimbus's prior approval. Biomerics shall promptly after receipt provide Nimbus with copies of all Regulatory Registrations and Regulatory Materials including FDA or other Governmental Authority correspondence and keep Nimbus informed of any developments concerning the Products and/or any Governmental Registrations. Nimbus shall be entitled to participate in all meetings with FDA and other Governmental Authorities regarding any Products or Regulatory Registrations. So long as Biomerics remains Nimbus's Regulatory Agent and/or manufacturer of the Products, Biomerics warrants and covenants (i) to exercise due care in preserving the value of the Products and the Regulatory Registrations; (ii) to not knowingly take any action that will impair the value of the Products, the Regulatory Registrations or the reputation or goodwill óf Nimbus; and (iii) to not assign, pledge, hypothecate, encumber or otherwise grant to any third party or any Affiliate any rights, liens or other encumbrances on any of the Products, the Regulatory Registrations or Regulatory Materials.

(f)     Nimbus shall reimburse Biomerics for any fees payable to Governmental Authorities associated with any Regulatory Registrations issued in Biomerics name; provided that Biomerics notifies Nimbus of such fees and obtains Nimbus's approval prior to incurring such fees.

4.3     In addition to the general responsibilities set forth above, Nimbus has engaged Biomerics to perform the specific responsibilities and to deliver the specific deliverables related to Regulatory Registration of the Nimbus Device and its manufacture as described in the quotes and invoices attached as <u>Exhibit D</u> (the "<u>Regulatory Registration Purchase Orders</u>"). The Parties hereby agree that performance of Regulatory Registration Purchase Orders shall be subject to the terms of this Agreement (and are incorporated herein by this reference). The Parties further acknowledge that of the total compensation payable to Biomerics for its performance (including the deliverables) under the Regulatory Registration Purchase Orders $71,365 remains unpaid by Nimbus. To the extent of any conflict or inconsistency between this Agreement and any of the Regulatory Registration Purchase Orders, the terms of this Agreement shall govern.

4.4     <u>Fulfillment Services</u>. At Nimbus discretion, it may contract Biomerics to ship Products to retail customers for a nominal shipping fee to be agreed upon by both Parties.

4.5    Service Warranty.  Biomerics shall perform any development, regulatory, fulfillment or other services contracted hereunder in a timely and professional manner, consistent with best industry practices and in accordance with this Agreement and applicable Laws and all services and any deliverables will conform to the specifications therefor.  In addition, SM shall not engage any third party or use the resources of any third party in performing any services for Nimbus hereunder, except as consented to in writing in each instance by Nimbus (which may be withheld in its sole discretion).  Biomerics shall not disclose to Nimbus or use in performing services or with any deliverable hereunder any trade secrets or other know-how, data, or other Intellectual Property of third parties that Biomerics does not have the absolute and unrestricted right to disclose and/or use and that Nimbus is not free to use without liability.

## 5.    Intellectual Property.

5.1    Background IP. All rights, title, and interest in and to any Background IP that existed as of the Effective Date shall continue to be owned by the Party (or Parties) that owned such Background IP as of the Effective Date, and Biomerics hereby grants to Nimbus and its Affiliates a non-exclusive, fully-paid up, royalty-free, worldwide, perpetual and irrevocable right and license (with the unrestricted right to assign and sublicense) to use and otherwise practice, any Biomerics Background IP that is necessary or useful in the development and commercialization of the Nimbus Device and any other Products. Subject to the foregoing license granted to Nimbus, Biomerics retains the right to sell or license Background IP and/or products manufactured using the Background IP to any third party at its sole discretion.

5.2    Products Intellectual Property.  Notwithstanding anything herein to the contrary, all rights, title, and interest, including  all Intellectual Property rights, in and to the Nimbus Device and any other Products (including  the respective manufacturing processes and methods of use of the Nimbus Device and such other Products) and any and all Developments (collectively, the "Product Intellectual Property") shall belong exclusively to Nimbus, and as such,  Biomerics shall not manufacture or supply any Products, any Developments or any products containing Developments or other Product Intellectual Property to any third party or for any other purpose other than supply to Nimbus or its customers as provided herein, without the written consent of Nimbus.

5.3    Assignment. Notwithstanding anything herein to the contrary, Biomerics, on behalf of itself and its Affiliates, hereby irrevocably assigns to Nimbus all of the right, title and interest of Biomerics and its Affiliates (including all Intellectual Property rights) that Biomerics and/or its Affiliates may have in any Product Intellectual Property, including but not limited to the Nimbus Device, any other Product and any Developments.  Without limiting the foregoing and by way of clarification, the rights assigned to Nimbus pursuant to this Section 5.3 shall include any and all applications of the Product Intellectual Property in and/or outside the Field.  Biomerics shall make prompt full written disclosure to Nimbus of any Product Intellectual Property when made, conceived or reduced to practice, and shall hold in trust for the sole right and benefit of Nimbus any Product Intellectual Property. Nimbus shall have the sole right to procure, prosecute, maintain, enforce and defend any patents, copyrights, trademarks or

12

other statutory protections throughout the world in and to the Product Intellectual Property. Biomerics shall, at Nimbus's request and expense, execute documents and perform such acts as Nimbus may deem necessary, to confirm in Nimbus, all right, title and interest throughout the world, in and to the Product Intellectual Property, and to enable and assist Nimbus in procuring, prosecuting, maintaining, enforcing and defending patents, copyrights, trademarks and other statutory protections throughout the world in and to the Product Intellectual Property. Biomerics shall cause each of its employees and/or contractors to execute and deliver to Biomerics an agreement assigning all of such party's right, title and interest (if any) in and to the Product Intellectual Property consistent with this Sections 5.3 so that sole and exclusive ownership therein resides in Nimbus.

     5.4    <u>Biomerics License</u>.    Nimbus hereby grants, during the Term of this Agreement, a non-exclusive, royalty-free, non-transferable license to Biomerics to use the Intellectual Property of Nimbus in the Field (including the Product Intellectual Property) solely to perform its obligations to Nimbus hereunder, including to manufacture and supply the Products for Nimbus and/or its distributors hereunder. The above license shall terminate, without notice, upon any termination or expiration of this Agreement. By way of clarification, Nimbus shall remain the sole owner or licensee, as applicable, of all Intellectual Property owned or licensed by Nimbus and Biomerics shall have no rights in or to such Intellectual Property except for the license expressly provided in this Section 5.4.

     5.5    <u>Infringement.</u>    Biomerics will promptly notify Nimbus if it becomes aware of any possible infringement, misuse or misappropriation by a third party of any Products Intellectual Property. As between Biomerics and Nimbus, Nimbus shall have the sole and exclusive right (but not the obligation) to defend or institute litigation in connection with any alleged infringement relating to any Product Intellectual Property at its own expense and solely for its own benefit. Biomerics agrees to cooperate with Nimbus as reasonably requested by Nimbus or required by applicable law in order to enforce any of such Products Intellectual Property, at Nimbus's expense, in any such litigation or other dispute.

     5.6    <u>Continuous Technology Transfer</u>.    During the Term of the Agreement and for 1 year after termination or expiration of this Agreement, upon Nimbus's request from time to time, Biomerics shall transfer to Nimbus copies of all documentation in Biomerics possession or control related to Product Intellectual Property (including the design and/or manufacture of the Products and any Product Developments) so that Nimbus has all of the information necessary or useful for the manufacture, testing, packaging, and labeling of any Product (including any Product Developments) manufactured and supplied to Nimbus by Biomerics hereunder (including specifications, manufacturing procedures and protocols, quality control procedures and data, vendor lists, and manufacturing equipment documentation and validation procedures). At Nimbus's request, Biomerics shall make such deliveries from time to time so that Nimbus shall have all current manufacturing information relating to the Products. For no additional consideration, Biomerics hereby grants to Nimbus and its Affiliates a non-exclusive, fully-paid up, royalty-free, worldwide, perpetual and irrevocable right and

license (with the unrestricted right to assign and sublicense) to use, copy, create derivative works and otherwise practice the documentation and information to be delivered pursuant to this Section 5.6 that Biomerics has not otherwise assigned to Nimbus pursuant to Section 5.3 above.

5.7    Product Tooling. Any production tooling exclusively used in the manufacture of any Product by Biomerics (the "Product Tooling") shall be, as between Biomerics and Nimbus, the sole property of Nimbus. Subject to the foregoing, the Product Tooling shall remain in the custody of Biomerics and Biomerics shall not use the Product Tooling for any purpose other than for the manufacture of Product. Biomerics shall effect and bear the reasonable expense of routine repair and maintenance to maintain the Product Tooling in good condition, reasonable wear and tear excepted. Biomerics shall (i) keep the Product Tooling free of any liens or encumbrances; and (ii) allow Nimbus to inspect the Product Tooling at its request. At the expiration or termination of this Agreement, or at any other time upon Nimbus's request, Nimbus shall have the right to have custody of the Product Tooling upon demand.

## 6.    Representations and Warranties.

6.1    Representations and Warranties.

(a)    *Mutual Representations and Warranties.* Each Party represents and warrants that (1) this Agreement has been duly and validly executed and delivered by such Party and constitutes the legal, valid, and binding obligation of such Party; (2) such Party has full authority and ability to execute, deliver, and perform this Agreement; (3) such Party's execution, delivery, and performance of this Agreement will not conflict with or violate (i) any provision of any Law to which such Party is subject, or (ii) any agreement or other instrument applicable to such Party or binding upon its assets or properties; and (4) the Person who executes this Agreement on behalf of such Party has read and fully understands this Agreement.

(b)    *Product Warranty; Remedy.*

(1)    Biomerics warrants that, as of the delivery date of each Product to Nimbus or its customer in accordance with this Agreement: (A) such Product is new (i.e., not re-furbished); (B) Biomerics has title to such Products and has conveyed such title to Nimbus in accordance with the terms of this Agreement; and (C) such Product is free from all security interests, liens and similar encumbrances, except any security interest, liens or encumbrances caused by acts or omission of Nimbus.

(2)    Biomerics warrants that each Product purchased under this Agreement: (A) is free from defects in material, manufacturing and workmanship; and (B) conforms to the Specifications as in effect as of the delivery date of such Product to Nimbus or its customer. The period of this warranty for each Product shall begin on the date of delivery of such Product to Nimbus or its customer hereunder and shall end on the expiration date designated on each unit of Product.

14

(3)     Nimbus may return any non-conforming Product for replacement at Biomerics's sole expense if such Product is mislabeled, shows visible defects, or does not comply with the requirements of an Order.  In addition, if any Product fails to satisfy the warranties set forth in this Section 6.1(b) (or otherwise fails to comply this Agreement), whether or not resold or delivered by Nimbus to a customer, Nimbus will have the right to return the alleged non-conforming Product to Biomerics. Such alleged non-conforming Product may be held for Biomerics's instructions and may be returned to Biomerics at Biomerics's expense, with a proper authorization to return (ATR). ATRs must be requested in writing and Product may not be return until Nimbus receives an ATR in writing from Biomerics.  At Biomerics's option, Biomerics will either promptly repair or replace the defective Product (subject to Biomerics's right to contest the Product return as provided below). Any Product repaired or replaced under warranty pursuant to this Agreement shall be warranted for the remainder of the original warranty period of that Product.  The repair and replace remedy set forth in this Section 6.1(b)(3) is the sole and exclusive remedy for any failure of the Product to satisfy the warranties set forth in Sections 6.1(b)(1) and (2); provided that, the forgoing shall not affect the indemnification rights of Nimbus for third party claims as provided under Section 7.  Notwithstanding the above, Biomerics may contest the return of any Product by providing Nimbus written notice of such contest within twenty (20) days of Biomerics's receipt of such alleged non-conforming Product.  Promptly thereafter, such contest shall be resolved through testing by an independent laboratory mutually agreed by the Parties and if Biomerics prevails Nimbus shall pay Biomerics's reasonable costs and expenses in connection therewith. The warranties contained in this Section 6.1(b) will survive any inspection, delivery, acceptance, payment and expiration or termination of this Agreement, and such warranties will run to Nimbus, its customers and their successors and assigns.

(c)     **DISCLAIMER OF ALL OTHER WARRANTIES.**  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER TO THE OTHER PARTY, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND ALL SUCH WARRANTIES ARE HEREBY EXPRESSLY EXCLUDED AND DISCLAIMED TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW.

**7.     Indemnification; Insurance; Liability Limitation.**

7.1     <u>Indemnification by Nimbus</u>.  Nimbus shall defend, indemnify, and hold harmless Biomerics and its Affiliates, and their respective directors, officers, employees, and equity holders ("<u>Biomerics Indemnitees</u>") from and against any and all liabilities, damages, costs, losses, and expenses (including reasonable attorney's fees) suffered or incurred by any Biomerics Indemnitees, resulting from any claim, suit or proceedings made or brought by a third party, to the extent arising out of or relating to any of the following, whether actual or alleged: (a) any breach of Nimbus's obligations under this Agreement, (b) any negligence or willful misconduct of Nimbus or its Affiliates, (c) any failure to comply with applicable Laws by Nimbus or its Affiliates, (d) any defect in the

15

design of any Product so long as such Product conforms to the Specifications approved by Nimbus in writing and has not been modified or used in any application or with any device for which it was not designed, where such defect would not have occurred but for such modification or misuse, or (e) any infringement or misappropriation of any Intellectual Property of a third party to the extent based upon the design of any Product so long as such Product conforms to the Specifications approved by Nimbus in writing and has not been modified or used in any application or with any device for which it was not designed, where such infringement or misappropriation would not have occurred but for such modification or misuse.  Nimbus shall have no indemnification obligations under this Section 7.1 for any claim, suit or proceeding to the extent arising or resulting from (1) any breach of Biomerics's obligations under this Agreement, (2) any negligence or willful misconduct of Biomerics or its Affiliates or contractors, (3) any failure to comply with applicable Laws by Biomerics or its Affiliates or (4) any defect in workmanship or materials of any Products supplied by Biomerics hereunder or any non-conformance of any of the Products supplied by Biomerics hereunder with the warranties set forth in Section 6.1(b).

7.2    Indemnification by Biomerics.  Biomerics shall defend, indemnify, and hold harmless Nimbus and its Affiliates, and their respective directors, officers, employees, and equity holders ("Nimbus Indemnitees") from and against any and all liabilities, damages, costs, losses, and expenses (including reasonable attorney's fees) suffered or incurred by any Nimbus Indemnitees, resulting from any claim, suit or proceedings made or brought by a third party, to the extent arising out of or relating to any of the following, whether actual or alleged: (a) any breach of Biomerics's obligations under this Agreement, (b) any negligence or willful misconduct of Biomerics or its Affiliates or contractors, (c) any failure to comply with applicable Laws by Biomerics or its Affiliates or its contractors, or (d) any defect in workmanship or materials of any Products supplied by Biomerics hereunder or any non-conformance of any of the Products supplied by Biomerics hereunder with the warranties set forth in Section 6.1(b).

7.3    Indemnification Procedure.  A claim to which indemnification applies under this Section 7 shall be referred to herein as an "Indemnification Claim".  If a Party (the "Indemnified Party") intends to claim indemnification under this Section 7, the Indemnified Party shall notify the other Party (the "Indemnitor") in writing promptly upon becoming aware of any claim that may be an Indemnification Claim (it being understood and agreed, however, that the failure by the Indemnified Party to give such notice shall not relieve the Indemnitor of its indemnification obligation under this Agreement except and only to the extent that the Indemnitor is actually prejudiced as a result of such failure to give notice).  The Indemnitor shall have the right to assume and control the defense of the Indemnification Claim at its own expense with counsel selected by the Indemnitor; provided, however, that the Indemnified Party shall have the right to retain its own counsel, with the fees and expenses to be paid by the Indemnified Party.  If the Indemnitor does not assume the defense of the Indemnification Claim as described in this Section 7.3, the Indemnified Party may defend the Indemnification Claim but shall have no obligation to do so.  The Indemnified Party shall not settle or compromise the Indemnification Claim without the prior written consent of the Indemnitor, and the Indemnitor shall not settle or compromise the Indemnification Claim in any manner

which would have a material adverse effect on the Indemnified Party's rights under his Agreement without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld, delayed or conditioned). The Indemnified Party shall reasonably cooperate with the Indemnitor at the Indemnitor's expense and shall make available to the Indemnitor all pertinent information under the control of the Indemnified Party, which information (to the extent it is Confidential Information) shall be subject to Section 9.

7.4     Insurance. Each Party, at its sole expense, will maintain in effect the following policies of insurance during the Term of this Agreement: (a) all insurance coverage required by federal and state law, including workers' compensation and employer's liability insurance, at or above the statutory minimum limits, (b) commercial general liability insurance with limits of not less than $1,000,000 per occurrence, providing coverage for personal injury or death and injury to or destruction of property, including loss of use, and (c) product liability insurance and product recall insurance with not less than $1,000,000 limit covering the Products. All insurance must be carried by companies rated "A, X" or better by A.M. Best. All liability insurance of a Party will designate the other Party as an additional insured. All such insurance must be primary and require the issuer to respond and pay prior to any other available coverage. Each Party agrees that it and anyone claiming by, through, under or in its behalf will have no claim, right to action, or right of subrogation against the other Party based on any loss or liability insured against under the foregoing insurance. Each Party will provide the other Party with certificates or adequate proof of the foregoing insurance annually upon renewal of such insurance or at the other Party's request. Such insurance policies or endorsements of a Party will entitle the other Party to receive notice at least 30 days prior to any cancellation (including for nonrenewal) or change. These insurance requirements will not serve to limit or relieve a Party of any obligations or liabilities under the Agreement. Notwithstanding the foregoing, Nimbus shall not be required to comply with this Section 7.4 until the first commercial sale of the Nimbus Device in the United States to an end-user after receipt of 510(k) clearance.

7.5     Liability Limitation. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, EXCEPT WITH RESPECT TO A BREACH OF THE CONFIDENTIALITY OBLIGATIONS UNDER SECTION 9 HEREOF OR A CLAIM OF A THIRD PARTY SUBJECT TO INDEMNIFICATION UNDER SECTIONS 7.1 OR 7.2, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL OR PUNITIVE DAMAGES CONCERNING THE SUBJECT MATTER HEREOF, INCLUDING FOR LOSS OF PROFITS, OR LOSS OF OPPORTUNITY OR USE OF ANY KIND, SUFFERED BY THE OTHER PARTY OR ITS AFFILIATES, WHETHER IN CONTRACT, TORT OR OTHERWISE.

## 8.   Term and Termination.

8.1     Term. This Agreement shall become effective as of the Effective Date and continue in force for a period of five (5) years from the date of the first commercial sale of the Nimbus Device in the United States to an end-user after receipt of 510(k)

clearance, unless earlier terminated as provided in this Agreement (the "Initial Term"). Nimbus shall have the option to extend the Initial Term for successive one (1) year periods (each, a "Renewal Term," and together with the Initial Term, the "Term"), upon providing written notice to Biomerics not less than ninety (90) days prior to the conclusion of the Initial Term or the then current Renewal Term, as applicable.

8.2     Termination.  This Agreement may be terminated:  (i) by either Party immediately upon written notice, if the other Party commits a material breach of any provision of this Agreement and such breach continues uncured for a period of thirty (60) days following written notice from the non-breaching Party; or (ii) by either Party, effective immediately, if the other Party files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency Law or makes or seeks to make a general assignment for the benefit of its creditors or applies for or consents to the appointment of a trustee, receiver or custodian for its or a substantial part of its property.

8.3     Termination by Nimbus.

(a)   This Agreement may be terminated by Nimbus immediately upon written notice upon Biomerics losing its status as an FDA registered medical device manufacturer.

(b)   Nimbus may terminate this Agreement immediately upon written notice in the event of a Change of Control of Nimbus or Biomerics or either of their respective Party Parent Companies. If Nimbus elects to terminate this Agreement pursuant to this Section 8.3(b) upon a Change of Control of Nimbus or its Party Parent Company, Nimbus shall pay Biomerics the "Change of Control Termination Fee" (as defined below) within 60 days of the effective date of the termination of this Agreement.  The Change of Control Termination Fee shall be deemed liquidated damages and not a penalty.  The Parties acknowledge and agree that the Change of Control Termination Fee is a reasonable estimate of any damages Biomerics may suffer or  incur as a result of Nimbus's termination of this Agreement pursuant to Section 8.3(b) upon a Change of Control of Nimbus or its Party Parent Company, considering all of the circumstances existing as of the Effective Date, the relationship of this sum to the range of harm to Biomerics that reasonably could be anticipated and the anticipation that proof of actual damages would be impractical or extremely difficult.  For the avoidance of doubt, no Change of Control Termination Fee or other fee or payment shall be due from Nimbus to Biomerics if Nimbus terminates this Agreement pursuant to Section 8.3(b) upon a Change of Control of Biomerics or its Party Parent Company or if Nimbus terminates this Agreement pursuant to any other rights it may have under this Agreement or otherwise. As used herein, the term "Change of Control Termination Fee" shall mean an amount equal to $400,000 less $100,000 for each 25,000 units of Product purchased by Nimbus hereunder so that if Nimbus purchases 100,000 units of Product, the Change of Control Termination Fee shall be zero.

8.4    Effect of Expiration and Termination. Notwithstanding anything else contained herein to the contrary, at Nimbus' option, upon expiration or termination of this Agreement,

(a)    Biomerics shall manufacture and ship, and Nimbus shall purchase from Biomerics in accordance with the terms and conditions of this Agreement, all Product subject to purchase orders then outstanding upon such expiration or termination; and,

(b)    Nimbus shall have the right, on a non-exclusive basis,  to continue to order Product from Biomerics at then current pricing and terms as provided herein and to Biomerics shall accept such orders and manufacture and supply such Product for up to 6 months after such termination or expiration.

8.5    Survival. Expiration or termination of this Agreement shall not relieve the Parties of any obligation accrued before such expiration or termination.  Upon expiration or termination of this Agreement, all rights and obligations of the Parties hereunder shall be terminated except any right or obligations of either Party which is expressly stated in Section 8.4, this Section 8.5 or elsewhere in this Agreement to survive the expiration or termination.  The following provisions shall survive the expiration or termination of this Agreement: Sections 2.6, 2.7, 3.2, 3.3, 3.4, 3.6, 3.10, 4.2(a), (b) and (e), 4.5, 5.1, 5.2, 5.3, 5.6, 6, 7, 8.4 and 8.5 and Sections 1 and 9 (to the extent applicable to the foregoing surviving Sections).

## 9.    Confidential Information.

9.1    Confidentiality.

(a)    During the Term of this Agreement, and for five (5) years thereafter, each Party shall hold in confidence, and may not use for purposes other than those authorized by this Agreement or disclose to a third party (except as specifically set forth herein or with the express prior written consent of the other Party) any and all Confidential Information of the other Party.  Notwithstanding anything herein to the contrary, and by way of clarification and for the avoidance of doubt, the Product Intellectual Property shall be deemed the Confidential Information of Nimbus.

(b)    Without limiting the generality of the foregoing, each Party may disclose Confidential Information to those employees, contractors or agents of such Party or its Affiliates who need to receive the Confidential Information in order to further the activities contemplated in this Agreement.  Each Party shall take sufficient precautions to safeguard the Confidential Information of the other Party, including obtaining appropriate commitments and enforceable confidentiality agreements.

(c)    Each Party understands and agrees that the wrongful disclosure of Confidential Information of the other Party may result in serious and irreparable damage to the other Party, that the remedy at Law or any breach of this covenant may be inadequate, and that the Party seeking redress hereunder shall be entitled to injunctive relief, without prejudice to any other rights and remedies to which such Party may be entitled.

(d)    The above notwithstanding, a Party may disclose specific Confidential Information of the other Party to the extent such disclosure is required by applicable Law including by court order; provided, that, in each case, the Party subject to such disclosure requirement informs the other Party of such requirement reasonably in advance of such disclosure and permits the other Party, at its expense, a reasonable opportunity to attempt, by appropriate legal means, to limit such disclosure. Any disclosure made in such case shall be no more extensive than is necessary to meet the minimum legal requirement imposed on the Party.

(e)    Upon expiration or termination of this Agreement, and at the written request of the disclosing Party, the receiving Party shall return all Confidential Information of the disclosing Party (including all copies, excerpts and summaries thereof contained on any media) or destroy such Confidential Information at the option of the disclosing Party; provided, however, that each Party may keep one archival copy of such Confidential Information in its legal files to monitor compliance herewith or to exercise its ongoing and/or surviving rights under this Agreement or as necessary to comply with applicable law.

9.2    No Publicity. Unless mutually agreed to by the Parties, the Parties will not make any advertisement, news release, public announcement, denial or confirmation regarding any aspect of this Agreement, or that the Parties have entered into an Agreement.

## 10.  Miscellaneous Provisions

10.1    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the Parties' successors and permitted assigns, if any.  Neither Party shall assign any of its rights or delegate any of its duties under this Agreement to any other Person, whether by agreement or by operation of law, without the express written consent of the other Party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, Nimbus may assign this Agreement to an Affiliate or to a successor to all or substantially all of the assets or business of Nimbus without the consent of Biomerics.

10.2    Relationship of the Parties.  The Parties are independent contractors, and nothing in this Agreement shall be construed to constitute any Party as the agent or representative of the other Party or the Parties as partners, joint venturers, co-owners or as participants in any other joint or common undertaking.

10.3    Force Majeure.  Any cause or circumstance of whatever nature which prevents or delays performance by a Party of its obligations hereunder, including  any riot, labor dispute, strike or civil disturbance, or any Law or action of a Governmental Authority, which cause or circumstance is not within the reasonable control of the Party chargeable, and which cannot by the exercise of reasonable diligence by such Party be prevented or overcome, shall extend the time for performance thereof, provided such cause or circumstance was the proximate cause of the failure to perform.

10.4    Cooperation.    The Parties agree promptly to cooperate in good faith to carry out the provisions of this Agreement and the activities contemplated thereby and shall also cooperate in good faith to resolve any disputes or differences which may arise in connection with the provisions hereof and the activities contemplated hereby. The Parties agree to execute and deliver all documents, provide all information, and take or forebear from all such actions as may be necessary to achieve the purposes of this Agreement.

10.5    Notices.    All notices, consents and approvals under this Agreement must be delivered in writing by courier, by overnight delivery service (e.g., Federal Express), by facsimile (with confirmation of receipt by intended recipient), or by certified or registered mail (postage prepaid and return receipt requested), to the other party at the address set forth below, and will be effective upon receipt or five business days after being deposited in the mail as required above, whichever occurs sooner. Either Party may change its address by giving notice of the new address to the other Party.

Biomerics, LLC                          Nimbus Concepts (Spine), Inc.
Attn: Travis Sessions                   Attn: Robert Wright
President and CEO                       President
2700 South 900 West, Suite D            925 Lincoln PH,
Salt Lake City, Utah 84119             Denver, Colorado 80203

10.6    Interpretation; Construction.    Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender, (b) words using the singular or plural number also include the plural or singular number, respectively, (c) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement; (d) the terms "Section," "Schedule," and "Exhibit" refer to the specified Section, Schedule, and Exhibit of this Agreement, (e) the terms "include," "includes," or "including" shall be deemed to be followed by the words "without limitation" unless otherwise indicated. Whenever this Agreement refers to a number of days, unless otherwise specified, such number shall refer to calendar days. The headings in this Agreement are for references purposes only and shall not affect in any way the meaning or interpretation of this Agreement. This Agreement shall be construed as if each Party has had the opportunity to participate in drafting it and shall not be construed against either Party.

10.7    No Third Party Beneficiaries.    The provisions of the Agreement are for the sole benefit of the Parties hereto and not for any creditor of a Party or for any other Person.

10.8    Modification, Amendment, and Waiver.    No modification or amendment to the Agreement and no waiver of any breach or provision hereof shall be valid unless made in writing signed by duly authorized representatives of the Parties. Any failure or delay by either Party to exercise or partially exercise any right, power or privilege hereunder shall not be deemed a waiver of any of the rights, powers, or privileges under this Agreement. The waiver by either Party of a breach of any term, condition, or

provision of this Agreement shall not operate as, or be construed as, a waiver of any subsequent breach thereof.

10.9    Records.  Each Party agrees to keep complete and accurate records of all of its activities under this Agreement, and the other Party shall have the right on reasonable notice during ordinary business hours, at its expense, to examine, and to take copies and excerpts from, such records. Such records shall be preserved and maintained and kept available for inspection pursuant to this Agreement for at least three (3) years from the termination of this Agreement, or any longer period as may be required by Law.

10.10    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, USA, without giving effect to its choice of law provisions, and, to the extent controlling, the Laws of the United States of America.

10.11    Remedies.  Except as otherwise provided for herein, no remedy conferred by any of the specific provisions of the Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder, now or hereafter existing at law or in equity or by statute or otherwise.  The election of any one or more remedies by Biomerics or Nimbus shall not constitute a waiver of the right to pursue other available remedies.

10.12    Severability.  If any provision in this Agreement is determined by a court of competent jurisdiction to be void, invalid, unenforceable, or illegal, that provision shall be construed, limited, modified or, if necessary, severed, to the extent necessary to eliminate its violability, invalidity, unenforceability, or illegality, and the other provisions of this Agreement shall remain unaffected and continue in full force and effect.  The Parties further agree to replace any invalid or severed provision with a new valid provision that has the economic and other effects most similar to the original provision.

10.13    Entire Agreement.  This Agreement constitutes the entire agreement and understanding of the Parties with respect to subject matters hereof and supersedes all prior written and oral communications, agreements, letters of intent, representations, warranties, statements, negotiations, understandings, and proposals, with respect to all such subject matters.

10.14    Counterparts.  This Agreement may be executed in counterparts or with detachable signature pages and shall constitute one and the same instrument binding both Parties as if each signed the same copy.  Once this Agreement is signed and delivered by both Parties, either by facsimile, mail, or otherwise, any reproduction made by reliable means (e.g., photocopy, digital scan, or facsimile) shall be deemed an original.

[Remainder of Page Intentionally Left Blank, Signature Page Follows]

EXECUTION COPY

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement as of the Effective Date set forth above.

**BIOMERICS, LLC,**
a Utah limited liability company

**NIMBUS CONCEPTS (SPINE), LLC**
A Delaware limited liability company


By: _____

By: _____

Name: Travis Sessions

Name: Robert Wright

Title: President and CEO

Title: President

EXECUTION COPY

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement as of the Effective Date set forth above.

BIOMERICS, LLC,
a Utah limited liability company

By: _____

Name: Travis Sessions

Title: President and CEO

NIMBUS CONCEPTS (SPINE), LLC
A Delaware limited liability company

By: _____

Name: Robert Wright

Title: President